BREASTED and others, administrators, *against* THE FARMERS' LOAN AND TRUST COMPANY.

In a life policy of insurance a provision that it should be void if the assured " shall die by his own hand," has reference to an act of criminal self destruction.

The self destruction of the insured while insane and incapable of discerning between right and wrong is not within the provision. GARDINER, JEWETT, and JOHNSON, JJ., *dissenting*.

This was an action brought in the supreme court in 1841 on a policy of insurance for $5000 made by the defendants upon the life of Hiram Comfort, on the 17th of April, 1839. It contained, among other provisions to avoid the policy that " in case the assured shall die by his own hands, or in consequence of a duel, or by the hands of justice, or in the known violation of any law," it should be void. The policy was set out in the declaration and it was averred that on the 25th of June, 1839, the assured died at Catskill " not by his own hand." The defendants pleaded the general issue and special pleas. In the latter it was alleged that the assured committed suicide by drowning himself in the Hudson river, and " so died by his own hand." The plaintiffs replied to the special pleas that when the assured so committed suicide " he was of unsound mind, and wholly unconscious of the act." The defendant demurred to the replications, and the supreme court overruled the demurrer and gave the plaintiffs judgment thereon. The opinion of the supreme court will be found in 4 *Hill*, *p.* 74. The cause was subsequently tried by referees upon the general issue contained in the pleadings, and they reported in favor of the plaintiffs for the sum payable by the policy, with interest from the time it became payable, amounting to $7026·13. They also reported specially, " That the assured on the 25th day of June, 1839,

threw himself into the Hudson river from the steam boat Erie, while insane, for the purpose of drowning himself, not being mentally capable at the time of distinguishing between right and wrong." Judgment was entered on the report, and the defendant appealed to this court.

*W. C. Noyes* for appellant. I. The question involved is one as to the interpretation of a contract, and as to the meaning attached to the language used by the parties in making it, and not whether they meant to define the common law offence of self murder or suicide. . Such a question is always to be determined by arriving at the intention, and in ascertaining if the words employed in the contract are to be understood in their ordinary acceptation, unless it is clear that they were employed in a different or more restricted sense.

II. The words of the policy, " in case he shall die by his own hand," do not mean, nor did the parties to the policy understand them as meaning the common law offence of felonious suicide, such as was usually visited with forfeiture of goods and ignominous burial; because, 1, It was intended to exclude all cases of a loss by the act of the party having an interest in causing it; a fundamental principal of the law of insurance. The words of the proviso operate as a classification of hazards, and the particular cases specified are excepted from the policy. The necessary result is, that every case of suicide or death by the party's own hand, irrespective of the state of mind in which he happened to be when it took place, is excluded.

2. A great variety of conflicting opinions as to the moral responsibility of persons committing self destruction have always been entertained; some contending that all suicide was the effect of insanity, and the unfortunate subject of it, therefore, guiltless; others, that the contrary was the more general rule: and it can not be that the parties to this contract are to be deemed to have left its construction

open to the difficult questions that would necessarily arise upon such a view of the policy, and in addition to limit its meaning to only one class of self destroyers. (3 *Mod. R.* 100, *Rex* v. *Silloway; Ray's Med. J. of Insanity*, §§ 329, 350; 1 *Beck's Med. Juris.*, 655; *Chitty's Med. Juris.*, 353.

3. The *criminal offence of suicide* is *always excepted* by *operation of law*, and it can not, therefore, be held that the parties expressly contracted for an exception, which the law itself always makes in such a contract; for if they had expressly stipulated that the criminal offence of suicide should be a loss within the policy, such a stipulation would have been *illegal* and *void*. (*Selwyn's N. P.*, *p.* 1043.)

4. These views are fully sustained by the English cases where the question was considered and *incidentally* as well as *directly decided*. Cases where it was *incidentally* considered: *Cowp. R.*, 669, *Tryce v. Fletcher. Doug. R.*, 789, *Berman v. Woodbridge. Blaney on Life Ins.*, 81–2. *Park on Ins.*, 440. 1 *Phil. on Ins.*, 2d ed., 577. Such is also the opinion of French jurists. (*Grun & Joliet, Traité des Assurances, pp.* 411 *to* 541, 428, § 386. Quenault *Traité des Assurances, p.* 476.) Cases where the question was *directly decided* : 5 *Scott's N. R.*, 418, *Borradale v. Hunter. S. C.* 5 *Man. & Gr.*, 639. 7 *London Jurist*, 443. 2 *Car. & Kirwan*, 134, *Schwabe v. Clift.* 2 *Com. Bench R.*, 437, or 3d *Man. Gr. and Scott. Clift v. Schwabe in Error in Exch. Chamber.*

5. On well settled common law principles, one who is a *lunatic* or *madly insane*, is just as amenable in a civil suit, for his acts, as a man of sound mind. And though a man is insane, his mind and will *do act* for all purposes connected with civil rights; and in this case it is clear that the drowning was *voluntary* and *the result of design*, adopted to produce precisely the result accomplished.

6. The court below did not decide the question presented upon the report of the referees; inasmuch as the replication averred that Comfort was *not only insane, but wholly*

*unconscious of what he did;* whereas the fact is now found, that he voluntarily *threw himself into the river for the purpose of drowning himself.*

The result of the preceding proposition is:—

1. That the court below should have rendered judgment for the defendant on the demurrers.

2. That the referees improperly admitted the evidence to show the insanity of the assured.

III.—But if the preceding positions are not well founded, still, the facts, as found by the referees, do not establish that the assured when he drowned himself was insane, in the legal sense of that term, so that he was not responsible for the act as a violation of a fundamental condition of the policy.

1. It was not necessary for the defendants to show that he had the *most perfect* understanding, or that he was entirely free and unrestricted in the use of it, or that he had a perfect and complete comprehension of the moral consequences of his act. A very moderate degree of understanding, with a sufficient ability to distinguish between right and wrong, was all that was necessary. (*Swin. on Wills*, 71. 26 *Wend.*, 296, *Alice Lispenard's Case. Chitty's Med. J.*, 354.)

2. The facts establish that the assured well knew that by throwing himself into the river he would be drowned, and that he intended to drown himself and knew it was morally wrong to do so. (1 *Beck*, 548, 555. *Pritchard on Insanity, p.* 26.

*S. Sherwood*, for respondents, insisted that the phrases " death by suicide" and " dying by his own hand" as used in policies of life insurance were equivalent terms, and imply self-destruction by one in the possession of his mental faculties; a criminal self-destruction; (1 *Hale pl. cor.* 412; 61 *E. C. L.* 135:) that a case is not within the exception in the policy when the assured died by his own hand while insane. (5 *Man. & Gran.* 639, 643 . 5 *Scott N. R.*, 418.)

Having no capacity as a moral agent the self-destruction is no more the act of the deceased than of the parties having him in charge. The good sense of the exceptions in this class of contracts is to prevent *intentional self-destruction*, whether it be expressed in the technical term suicide, or death by his own hand. And it follows, that the *intent* to affect a contract in the making, or destroying of it, must be such an intent as can be formed by a sane mind: a person *non compos* can neither make a bond, nor release a bond.

WILLARD, J., delivered the opinion of the court. The question raised by the decision of the referees is substantially the same as that decided by the supreme court on the demurrer. (4 *Hill*, 73.) It will be unnecessary, therefore, to give to each a separate examination.

It is material to determine, in the first place, what is meant by the term *death by his own hand*, which is to avoid the policy. If the words are construed according to the *letter*, an accidental death occasioned by the instrumentality of the *hand* of the insured would fall within the exception. Thus, should the insured by mistake swallow poison and thereby terminate his life, his representatives could not recover the policy, if the poison was conveyed to his mouth by *his own hand*. The same rule of construction applied to the words, death *by the hands of justice*, in the same connection, would take the case out of the exception, if the death was occasioned by strangulation by a *rope* instead of the *hands* of the minister of justice. But it is too plain for argument that the *literal* meaning is not the true meaning of either phrase. Death by *the hands of justice* is a well known phrase, denoting an execution, either public or private, of a person convicted of crime, in any form allowed by law. The moral guilt of the party executed has nothing to do with the definition. Socrates, though he took the poison from his own hand, died by the hands of justice, in this sense of the term

It would be an abuse of language to charge him with an act of intentional self-destruction. The martyrs who perished at the stake, in like manner " died by the hands of justice."

In popular language the term *death by his own hand,* means the same as *suicide,* or *felo de se.* The first two, indeed, are not technical terms, and *may* be used in a sense excluding the idea of criminality. The connection in which they are used in this policy, indicates that the phrase, *death by his own hand,* meant an act of. criminal self-destruction. Provisos declaring the policy to be void in case the assured *commit suicide* or *die by his own hand,* are used indiscriminately as expressing the same idea. In the note to *Borradale v. Hunter,* 5 *Man. & Gr.,* 648, are given the forms of the proviso, and by seventeen of the principal London insurance companies. In eight of them the exception is of a death *by suicide,* and in nine, of a *death by the assured's own hands.* In two, a separate provision is made in case of a death by *suicide* not *felo de se,* and in two others in case of a *death by* his *own hands* not *felo de se.* It is obvious, therefore, that the phrase, death by *his own hand,* and death *by suicide* mean the same thing, and that both, unless qualified by some other expressions, import a criminal act of self-destruction. The connection in which they stand in this policy favors this construction. The first four exceptions in the policy are of acts innocent in themselves, three of which become inoperative if the defendants give their consent and have it endorsed on the policy. Then follow the last four exceptions, viz. *if he shall die by his own hand, or in consequence of a duel, or by the hands of justice, or in the. known violation of any law, &c.* By the acknowledged rule of construction, *noscitur a sociis,* the first member of the sentence, if there be any doubt in its meaning, should be controlled by the other members, which are entirely unequivocal, and should be construed to mean a felonious killing of himself. *Broome's Maxims,* 450, 293. It is a note laid down by Lord

Breasted *against* The Farmers' Loan and Trust Co.

Bacon that, *copulatio verborum indicat acceptionem in eodem sensu;* the coupling of words together shews that they are to be understood in the same sense. And when the meaning of any particular word is doubtful or obscure, or when the expression, taken singly, is inoperative, the intention of the parties using it may frequently be ascertained and carried into effect by looking at the adjoining words, or at expressions occurring in other parts of the same instrument, for *quae non valeant singula juncta juvant. Bacon's Works, vol. 4, p. 26; 2 Buls.; Moore's Maxims, 293.* Besides, the words in this case are those of the insurer, and if susceptible of two meanings, should be taken strongly against him.

It was not contended on the part of the defendant that the policy would be avoided by a mere *accidental* destruction of life by the party himself. It was urged that it would be, if the act was done *intentionally,* although under circumstances which would exempt the party from all moral culpability. It was insisted that the expression must be taken to mean a death *by his own act.* It seems to me that this is a yielding of the whole question. An insane man, incapable of discerning between right and wrong, can form no intention. His acts are not the result of thought or reason, and no more the subject of punishment than those which are produced by *accident.* The acts of a madman which are the offspring of the disease, subject him to no criminal responsibility. If the insured, while engaged in his trade as a house joiner, had accidentally fallen through an opening in the chamber of a house he was constructing, and lost his life, the argument concedes that the insurer would have been liable. The reason is that the mind did not concur with the act. How can this differ in principle from a death in a fit of insanity, when the party had no mind to concur in or oppose the act.

It must occur to every prudent man, seeking to make provision for his family by an insurance on his life, that

Sel. IV.—39

insanity is one of the diseases which may terminate his being. It is said the defendants did not insure the continuance of the intestate's reason. Nor did they in terms insure him against the small pox or scarlet fever, but had he died of either disease no doubt the defendants would have been liable. They insured the continuance of his life. What difference can it make to them or to him, whether it is terminated by the ordinary course of a disease in his bed, or whether in a fit of delirium he ends it himself. In each case the death is occasioned by means within the meaning of the policy, if the exception contemplates, as I think it does, the destruction of life by the intestate while a rational agent, responsible for his acts.

It is competent no doubt for the insurer so to frame his policy as to exempt him from liability for a death occasioned in a fit of insanity. The parties have not done so in the present case.

It is urged that because a person *non compos mentis* is liable *civiliter*, for torts committed while in a state of insanity, therefore insanity has no effect to qualify this exception in the policy. That conclusion is not a legitimate deduction from the premises. A rational man is liable *civiliter*, for an injury occasioned by an accident, unless it be an inevitable one, and yet no one pretends that the insurer is not liable for a death by accident, whether inevitable or not. Indeed, the liability for death by accident was conceded on the argument. A death by accident, and a death by the party's own hand, when deprived of reason, stand on principle in the same category. In both cases the act is done without a controlling mind. If the insurer is liable in the one case, he should be in the other.

If the insured was compelled by *duress* to take his own life, it will hardly be contended that the insurer could avoid payment. In what consists the difference between the duress of man and the duress of Heaven? Can a man .

be said to do an act prejudicial to the insured when he is compelled to do it by irresistible coertion; and can it make any difference whether this coertion come from the hand of man or the visitation of Providence?

But it is urged that this is a civil action, and the contract of insurance a civil contract. Be it so. A person so destitute of reason as not to know the consequences of his acts can make no valid contract. Whether the incompetency be the result of disease or of intoxication, his contracts made while in that condition are void. (*Barret* v. *Baxter*, 2 *Aiken Vt. Rep.* 167, approved by Ch. Walworth in *Prentice* v. *Ackom*, 2 *Paige*, 31, and by Ch. Kent in 2 *Com.* 451; *Smith's Law of Contracts*, 329, 333, *and notes.*) If the party could do no act to bind himself, he certainly could do none to discharge the insurer. If he could not make a bond, he could not make a release. If he could not make a will, he could not revoke one.

The liability of a lunatic for necessaries rests upon the ground that the law will raise a contract by implication on the part of the lunatic, in favor of the party who has supplied them in good faith, and therefore does not affect the present question. (*Wentworth* v. *Tubbs*, 1 *Young and Col. N. C.* 171.) The cases on this head are analagous to that of an infant. See *Smith's Law of Contracts*, 325, *et seq. and notes*, where the cases are collected and reviewed. The law to prevent a failure of justice will *imply a promise* by a party incapable of making a contract; but it will never imply that a party incapable of distinguishing between right and wrong was guilty of a fraud.

At the time this case was decided by the supreme court on the demurrer, there had been no case either in this country or in England in which the same question had arisen. The case of *Borradale* v. *Hunter*, (5 *Man. & Gr.* 639,) decided by the English common pleas in 1843, has since been reported. That action was brought by the executor of the insured upon a life policy containing a proviso, that in case the assured should die by his own

hands, or by the hands of justice or in consequence of a duel the policy should be void. The assured threw himself into the Thames and was drowned. Upon an issue, whether the assured died by his own hands, the jury found that he *voluntarily* threw himself into the water, *knowing* at the time that he should thereby destroy his life, and intending thereby to do so; but at the time of committing the act he was not capable of judging between right and wrong. It was held by a majority of the court, Tindal, Ch. J., dissenting, that the policy was avoided, as the proviso included all acts of *voluntary* self-destruction and was not limited by the accompanying provisos to acts of felonious suicide. The three judges who formed the majority, laid the main stress upon the fact, that the jury found the act of self-destruction to be *voluntary*, that he knew when he threw himself into the river he should thereby destroy his life, and that he intended thereby to do so. The referees in the present case have not found that the intestate acted *voluntarily*, or that he *knew* the consequence of his act. They merely find that while insane, for the purpose of drowning himself, he threw himself into the river, not being mentally capable of distinguishing between right and wrong. If *Borradale* v *Hunter* be an authority which we ought to follow, it differs so much from the case before us, that we are at liberty to decide it upon principle.

After the case of *Borradale* v. *Hunter*, the case of *Schwabe* v. *Clift* was tried at nisi prius, before Cresswell, J. It was upon a policy upon the life of the plaintiff's intestate, containing the proviso that if the assured should " *commit suicide*, or die by dueling or by the hands of justice, the policy should be void. The assured died from the effects of sulphuric acid taken by himself, but evidence was given tending to show that at the time he took the sulphuric acid, he was in part of unsound mind. In his charge to the jury, the learned judge said that to bring the case within the exception, it must be made to appear that

the deceased died by his own *voluntary* act; that at the time he committed that act, he could distinguish between right and wrong, so as to be able to understand and appreciate the nature and quality of the act he was doing; and that, therefore, he was at that time a responsible being. The jury found for the plaintiff. (2 *Car. & Kirwan*, 134.) This cause was afterwards brought into the court of exchequer chamber on bill of exceptions, and will be found in 3 *Man. & Gr.*, 437, by the title of *Clift* v. *Schwabe*. That court, by a vote of four to two, ordered a new trial, holding that the direction was erroneous; for that the terms of the condition included all acts of *voluntary* self-destruction, and therefore, if A voluntarily killed himself, it was immaterial whether he was or was not at the time a responsible moral agent.

This case is open to the same remark as *Borradale* v. *Hunter*, *supra*. It turned upon the assumed fact that the act of suicide was *voluntary*; a fact not found by the referees in this case.

GARDINER, J., dissenting.

The referees in this case have found, " That the assured on the twenty-fifth day of June, 1839, threw himself into the Hudson river, from the steam boat Erie, while insane, *for the purpose* of drowning himself, not being mentally capable at the time of distinguishing between right and wrong." The question is whether this act avoided the life policy in question, one condition of which is, that if the assured "should die by his own hand." the policy should be void.

It is by the finding established, that the assured cast himself into the river for the purpose of drowning himself. The act committed by him was therefore voluntary, and accompanied by so much intelligence as to enable the agent to contemplate a particular result, and adopt the means requisite to accomplish it. His object was self-destruction by drowning. For this purpose he cast him-

self into the river, and thereby effected it. If this was not " dying by his own hand" within the spirit and intent of this clause of the policy, it is difficult to attach any legal significance, to such language.

If under the same circumstances the assured had destroyed the property or assaulted the person of a citizen, he would have been civilly responsible for all the damages sustained by the latter. (*Weaver* v. *Ward, Hob.* 134. *Cross* v. *Andrews, Cro. Eliz.* 622.) Insanity unless it suspended the power of volition would be no justification; still less a want of moral perception to distinguish between right and wrong.

I can perceive no reason why upon the same principle he should not be held responsible for a willful breach of contract resulting from self-destruction, where it was premeditated, and accomplished by means usual, and appropriate, to effect his design. In *Bagster* v. *the Earl of Portsmouth*, (7 *Dowl. & Ryland*, 614,) it was held that a lunatic was capable of contracting for necessaries. " Imbecility of mind, says C. J. Abbott, may, or may not be a defence in the case of an unexecuted contract." These cases show, that the assured, although insane, is a responsible agent for some purposes, and consequently, *a fortiori,* that he can be affected and bound by a condition which qualifies the liability of the insurers, and which in terms, is made to depend upon an act, to be performed by the former.

In *Borradale* v. *Hunter*, (5 *Manning & Granger*, 639,) in a life policy containing the same proviso found in the one before us, the jury found that the insured, " voluntarily threw himself into the water, knowing at the time, that he should thereby destroy his life, and intending thereby to do so, but at the time of committing the act, he was not capable of judging between right and wrong."

It was held that the policy was avoided. The proviso included all acts of self-destruction, and was not limited by the accompanying provisos to acts of felonious suicide.

This decision was pronounced in 1843, and the case is not distinguishable from the one under consideration. The case cited was argued, and decided as one of insanity, in which however the assured was capable of voluntary action. Erskine, J., remarked " that all the contract required, was, that the act of self-destruction should be the voluntary and willful act of a man, having, at the time, sufficient power of mind to understand the physical nature and consequence of the act, and having the intention to choose his own death."

In that case, and in the present, the incapability of distinguishing between right and wrong was the measure of the insanity of the assured. Four years afterwards, *Clift* v. *Schwabe* was decided in the *Exchequer Chamber*, (54 *Eng. Com. L. R.* 437. § 3. 3 *Manning, Granger and Scott*) upon a policy in which the word suicide occured in place of the phrase " dying by his own hands." The issue was upon the fact of suicide, and an exception to the charge of the judge: it was held that the terms of the condition included all acts of voluntary self-destruction, and if the insured voluntarily killed himself, it was immaterial whether he was or was not a responsible moral agent.

These cases are directly in point: that last mentioned is much stronger for the assured than the one now under consideration.

When this case was before the supreme court on demurrer, the replication averred that when the assured drowned himself he was of *unsound mind, and wholly unconscious of the act.* This was admitted by the demurrer, and the question whether voluntary action can exist without some degree of consciousness, is very different from the one presented in by the finding before us.

I think the judgment of the supreme court should be reversed.

Upon the disposition of the case, RUGGLES, Ch. J.,

WILLARD, MORSE, MASON and TAGGART, JJ., were in favor of affirmance of the judgment, and GARDINER, JEWETT and JOHNSON, JJ., for a reversal.

Judgment affirmed.