[Civ. No. 18690. First Dist., Div. One. May 17, 1960.]

LINDA JUSTINE TATE, a Minor, etc., et al., Appellants, v. RENE CANONICA et al., Respondents.

Daniel Kass for Appellants.

Marvin G. Giometti and Arguello, Giometti & McCarthy for Respondents.

DUNIWAY, J.—Plaintiffs appeal from a judgment against them entered after an order sustaining a demurrer to their complaint without leave to amend.

### THE QUESTION PRESENTED

Can a cause of action be predicated upon either the intentional or the negligent infliction of mental distress, which culminates in the suicide of the victim?

### THE COMPLAINT

Plaintiffs are respectively the widow and children of Justin S. Tate, deceased. The first count alleges that defendants "intentionally made threats, statements and accusations against said deceased for the purpose of harassing, embarrassing, and humiliating him in the presence of friends, relatives and business associates"; that due thereto deceased became "physically and mentally disturbed" and as a direct result committed suicide. The second count charges that the making of the threats, statements and accusations was negligently done. For the loss of the society, comfort, protection and support of the husband and father, plaintiffs ask damages of $496,000 and punitive damages of $25,000. Defendants demurred generally and specially. The order sustaining the demurrer does not show upon what grounds it was sustained. While the complaint is clearly uncertain and ambiguous and thereby subject to the special demurrer, the main question is whether the complaint states or can state a cause of action.

### DOES THE COMPLAINT STATE A CAUSE OF ACTION?

It is not alleged that the acts complained of were done for the purpose of causing deceased to commit suicide, but it is stated that they were committed for the purpose of harassing, embarrassing and humiliating deceased, and caused him to become physically and mentally disturbed, as a result of which deceased took his life.

1. *The Parties' Contentions.*

Beyond advising us that no reported California case has passed upon the questions presented, appellant's brief is of no help to us. If appellants' counsel was aware of any authority on the questions elsewhere, he has not troubled to call it to our attention. Counsel's duty to assist the court includes a duty to study and to discuss the available authorities, both in California and, at least where there are none in California, in other jurisdictions. We would have more con-

fidence in the completeness and sufficiency of our own research if counsel had performed this duty. We have had some help from defendants' counsel, and have been materially assisted by a very full note appearing in 11 A.L.R.2d at page 751.

Plaintiffs' counsel argues "that with the many advances in the field of psychiatry, sufficient proof medically and factually can be produced to prove the allegations of the complaint," and "that proximate cause is always a question of fact." With the first proposition, we do not quarrel; the second is clearly wrong, else no nonsuit, directed verdict, or judgment notwithstanding the verdict would ever be granted in a case involving the question "is cause A the proximate cause of result B." ■■■ Proximate cause is legal cause, as distinguished from the layman's notion of actual cause, and is always, in the first instance, a question of law. (Prosser, Torts, 2d ed., ch. 9, § 47, p. 252; § 50, p. 281; Rest., Torts, § 453; Prosser, *"Proximate Cause in California,"* 38 Cal. L. R. 369, 419-420; *Stasulat* v. *Pacific Gas & Elec. Co.,* 8 Cal. 2d 631, 638 [67 P.2d 678]; *cf. McEvoy* v. *American Pool Corp.,* 32 Cal.2d 295, 298-299 [195 P.2d 783].) ■■■ It becomes a question of fact when conflicting inferences or conclusions can be drawn from the evidence within the area of proximate cause as legally defined.

Defendants' counsel takes the flat position that suicide is always an independent intervening cause, thus breaking the chain of legal causation in every case, and absolving the actors, in this case the defendants, from responsibility. We do not agree, although the earlier cases seem to support defendants' position.

2. *Suicide in the Early Common Law.*

At common law, suicide was a felony. Blackstone states the rule with his usual elegance as follows (4 Blackstone's Commentaries, (1778), 8th ed., ch. 14, p. 189): "SELF-MURDER, the pretended heroism, but real cowardice, of the Stoic philosophers, who destroyed themselves to avoid those ills which they had not the fortitude to endure, though the attempting it seems to be countenanced by the civil law, yet was punished by the Athenian law with cutting off the hand, which committed the desperate deed. And also, the law of England wisely and religiously considers, that no man hath a power to destroy life, but by commission from God, the author of it: and, as the suicide is guilty of a double offense; one spiritual, in invading the prerogative of the Almighty,

and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony, a felony committed on one's self. And this admits of accessories before the fact, as well as other felonies; for if one persuades another to kill himself, and he does so, the adviser is guilty of murder. . . . The party must be of years of discretion, and in his senses, else it is no crime. But this excuse ought not to be restrained to that length, to which our coroner's juries are apt to carry it, viz. that the very act of suicide is an evidence of insanity; as if every man, who acts contrary to reason, had no reason at all: for the same argument would prove every other criminal non compos, as well as the self-murderer. The law very rationally judges, that every melancholy or hypochondriac fit does not deprive a man of the capacity of discerning right from wrong; which is necessary, as was observed in a former chapter, to form a legal excuse. And therefore if a real lunatic kills himself in a lucid interval, he is a felo de se as much as another man. "But now the question follows, what punishment can human laws inflict on one who has withdrawn himself from their reach? They can only act upon what he has left behind him, his reputation and fortune: on the former by an ignominious burial in the highway, with a stake driven through his body; on the latter, by a forfeiture of all his goods and chattels to the king: hoping that his care for either his own reputation, or the welfare of his family, would be some motive to restrain him from so desperate and wicked an act."

Pollock and Maitland (2 History of English Law, 2d ed., p. 488) place the rule on much more mundane grounds: "As to suicide Bracton seems to have had many doubts, and at one time he was for giving the name felo de se only to a criminal who killed himself in order to escape a worse fate. We think that the practice of exacting a forfeiture of goods in every case in which a sane man put an end to his own life was one that grew up gradually, and that thus the phrase felonia de se gained an ampler scope."

Holdsworth agrees with Pollock and Maitland. He says (3 History of English Law, 3d ed., rewritten, p. 315): "It was settled during this period [1066-1485] that the person who intentionally took his own life was guilty of felony, in spite of Bracton's doubts. Probably, as Maitland says, the practice of always exacting a forfeiture of goods in such

cases determined the question. Such forfeiture was the usual accompaniment of felony. But the severity of the law was relaxed in the case of the man who was of unsound mind, or the man who slew himself by misadventure. In later law the freedom with which juries found 'temporary insanity' has rendered the crime of very infrequent occurrence."

It will be noted that Blackstone, in defining the crime, states that the suicide must have been "in his senses"—must have had "the capacity of discerning right from wrong," or he is no felon. These are essentially the tests later laid down in M'Naghton's case, and still followed in this state in defining the kind of "insanity" that is a defense to a charge of crime today. (Compare: *People* v. *Kimball,* 5 Cal.2d 608 [55 P.2d 483] ; *People* v. *Walter,* 7 Cal.2d 438 [60 P.2d 990] ; *People* v. *French,* 12 Cal.2d 720 [87 P.2d 1014] ; *People* v. *Coleman,* 20 Cal.2d 399 [126 P.2d 349] ; *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53] ; *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911] ; *People* v. *Baker,* 42 Cal.2d 550 [268 P.2d 705] ; *People* v. *Berry,* 44 Cal.2d 426 [282 P.2d 861] ; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492] ; *People* v. *Nash,* 52 Cal. 2d 36 [338 P.2d 416].)

But suicide is not and never has been a crime in California. Our Penal Code does provide (§ 401) that "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." This follows Blackstone, and is perhaps of some significance in the present case, for it does recognize the responsibility of a third person for helping to cause a suicide. The precise question, however, is not before us, as it is not alleged that any of the defendants intended to cause decedent to commit suicide.

Apparently it was only in comparatively recent times that any attempt was made to hold a defendant civilly liable for causing the suicide of another. The earlier cases seem to hold, as a matter of law, that suicide is an independent intervening cause, so that there can be no liability for acts, whether done with intent to injure or negligently, that cause suicide. We think that these cases have behind them, as an unspoken major premise, the views of Blackstone as to the criminal nature of suicide and the type of punishment visited upon the suicide's family. But, because suicide is not a crime in California, we feel free to reexamine those cases and adopt rules that appear to us most consonant with modern knowledge and conditions.

### 3. *Liability for intentional injury causing suicide.*

It will be recalled that the complaint, in the first cause of action, charges the intentional doing of acts which caused the decedent to become physically and mentally disturbed, and that as a direct result thereof, he committed suicide. The law has for a long time recognized a distinction between intentional and negligent torts, and has generally recognized fewer defenses, and been more inclined to find that defendant's conduct was the legal cause of the harm complained of, where the tort is intentional. (*Cf.* Holmes, ''Privilege, Malice, and Intent,'' in ''Collected Legal Papers,'' p. 117 ff; Civ. Code, §§ 1708, 1714.) Indeed, it appears that many of the limitations upon liability that are subsumed under the doctrine of ''proximate cause,'' as usually expounded in negligence cases, do not apply to intentional torts. Thus the Restatement of Torts, section 279, says ''If the actor's conduct is intended by him to bring about bodily harm to another which the actor is not privileged to inflict, it is the legal cause of any bodily harm of the type intended by him which it is a substantial factor in bringing about.'' Section 280 applies the same rule to ''liability for conduct intended to invade other interests of personality . . .''

### (a) *Liability for intentionally causing mental distress.*

In this state, the courts have imposed liability for intentionally subjecting a person to mental distress. As Dean Prosser says (Prosser, Torts, 2d ed., ch. 2, § 11, p. 38) : ''In recent years the courts have tended to recognize the intentional infliction of mental or emotional disturbance as a separate tort.'' The Restatement of Torts, sections 46 (as revised) and 312 are in accord.

In *Bowden* v. *Spiegel, Inc.* (1950), 96 Cal.App.2d 793 [216 P.2d 571], it was held that a complaint stated a cause of action for damages which charged that the plaintiff became sick and ill as a result of a phone conversation in which the defendant unwarrantedly threatened, harassed and vexed the plaintiff. The opinion cites a number of cases upholding the right to damages for physical injury resulting from ''mere words oral or written.'' (P. 795.) In *Emden* v. *Vitz* (1948), 88 Cal.App. 2d 313 [198 P.2d 696], the plaintiff became physically ill as the result of emotional distress consequent upon the defendants' unjustified statements to her. The court upheld an award of damages to the plaintiff. It reviewed a number of cases in California and elsewhere and stated that the doctrine that physical injuries resulting without impact, from mental dis-

tress, were actionable, has been consistently upheld in California. It stated that once the wrongful character of the conduct which induces physical harm through its effect on the mind and nervous system is established, ". . . it matters not whether that conduct consisted of acts alone, or of acts accompanied by words, or of mere spoken words alone, for the legal inquiry in each case is thenceforth confined to the well-established channels of proximate cause and damages." (Pp. 318-319.)

*State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330 [240 P.2d 282], was an action on promissory notes. The defendant cross-complained to cancel those notes on the ground that they were obtained by duress, and sought damages for illness caused by the threats made against him by the plaintiff. An award of damages to the defendant by a jury was upheld. The court said (p. 336) : ". . . a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault.

"In the past it has frequently been stated that the interest in emotional and mental tranquility is not one that the law will protect from invasion in its own right," citing cases and certain sections of the Restatement of Torts. It then stated (pp. 336-338) : "The Restatement recognized, however, that in many cases mental distress could be so intense that it could reasonably be foreseen that illness or other bodily harm might result. If the defendant intentionally subjected the plaintiff to such distress and bodily harm resulted, the defendant would be liable for negligently causing the plaintiff bodily harm. (Restatement, Torts, §§ 306, 312.) Under this theory the cause of action was not founded on a right to be free from intentional interference with mental tranquillity, but on the right to be free from negligent interference with physical well-being. A defendant who intentionally subjected another to mental distress without intending to cause bodily harm would nevertheless be liable for resulting bodily harm if he should have foreseen that the mental distress might cause such harm.

"The California cases have been in accord with the Restatement in allowing recovery where physical injury resulted from intentionally subjecting the plaintiff to serious mental distress. [Citations.]

"The view has been forcefully advocated that the law should

protect emotional and mental tranquillity as such against serious and intentional invasions [citations], and there is a growing body of case law supporting this position. [Citations.] In recognition of this development the American Law Institute amended section 46 of the Restatement of Torts in 1947 to provide:

" 'One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it.'

"In explanation it stated that 'The interest in freedom from severe emotional distress is regarded as of sufficient importance to require others to refrain from conduct intended to invade it. Such conduct is tortious. The injury suffered by one whose interest is invaded is frequently far more serious to him than certain tortious invasions of the interest in bodily integrity and other legally protected interests. In the absence of a privilege, the actor's conduct has no social utility; indeed, it is anti-social. No reason or policy requires such an actor to be protected from the liability which usually attaches to the wilful wrongdoer whose efforts are successful.' (Restatement of the Law, 1948 Supplement, Torts, § 46, comment d.)

"There are persuasive arguments and analogies that support the recognition of a right to be free from serious, intentional, and unprivileged invasions of mental and emotional tranquillity. If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of [citations], and in the case of many torts, such as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages. [Citations.] In cases where mental suffering constitutes a major element of damages it is anomalous to deny recovery because the defendant's intentional misconduct fell short of producing some physical injury."

(b) *The extent of liability for intentionally causing mental distress.*

Comment C to section 279 of the Restatement of Torts, *supra,* succinctly states the distinction between an intentional tort and a negligent tort. "The rule stated in this Section as determining the causal relation necessary to make the actor liable for bodily harm of the type which he intends to inflict differs in several important particulars from those which

determine the causal relation necessary to make a negligent actor liable for harm resulting from his negligence.

"First, in determining whether the actor's conduct is a substantial factor in bringing about harm of the type which he intended to inflict upon the other, no consideration is given to the fact that after the event it appears highly extraordinary that it should have brought about such harm or that the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible (compare § 433, clauses (b) and (c)).

"Second, all that is necessary to make the actor liable under the rule stated in this Section is that his conduct is a substantial factor in bringing about an injury of the type which he intended to inflict. There are no rules which relieve the actor from liability because of the manner in which his conduct has resulted in the injury such as there are where the liability of a negligent actor is in question (compare § 431, clause (b)). Therefore, the fact that the actor's conduct becomes effective in harm only through the intervention of new and independent forces for which the actor is not responsible is of no importance (see §§ 441 to 452). So too, the fact that the operation of the new force was unexpectable by the actor or even that after the event it appears highly extraordinary that it had operated does not relieve the actor from liability for harm of the type which he intended to inflict (see § 442, clause (b)). So too, the wrongful character of the intervening force is of no moment. This is so not only where the injury is brought about by an intervening negligent act of a third person (see § 447), but also where it is brought about by the tortious or criminal act of a third person which itself is intended to bring about the harm which is sustained by the other (compare § 448 and Caveat thereon)." Section 280 of the Restatement makes it clear that these comments apply also to "liability for conduct intended to invade other interests of personality," that is, other than bodily harm.

Section 433, clauses (b) and (c) and sections 441-452, referred to in the above comment, are those dealing with proximate and intervening causes, and it is thus made clear that the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation.

The revision of section 46 of the Restatement of Torts, quoted and discussed in *State Rubbish etc. Assn.* v. *Siliznoff*,

*supra,* is clearly in accord with the foregoing discussion.

That the notion of intervening or superseding cause, as commonly applied in negligence cases, is really not a matter of causation, but an attempt to spell out rules of law limiting the liability of a negligent actor, using the *language* of causation, is ably demonstrated by Prosser in his article in 38 Cal. L. R., cited *supra.* Thus, at page 398, he says: "This too has nothing to do with causation, and arises only after it has been established that the defendant's conduct has been in fact a cause of the injury. Essentially it is a question of whether the defendant shall be relieved of responsibility for the result of his fault for the reason that another cause which has contributed to that result is regarded as playing a more important, significant and responsible part. Again the issue is merely one of the policy which imposes liability, and any attempt to deal with it in the language of the fact of causation can lead only to perplexity and bewilderment." And again, at page 406: "If attention is directed, not at the original risk but at the intervening cause itself and whether it should supersede the defendant's responsibility—if, in other words, the question is asked, why should he *not* be liable for what he has clearly caused—the answer is much easier to give. The question becomes one of whether the intervening cause is, in retrospect, so abnormal and irregular, so external, foreign and unrelated to the defendant's original conduct, that it should relieve him of liability."

We can see no good reason of policy that would relieve the defendants of liability under the first cause of action, if the suicide can be shown to have been in fact caused by the type of injury that the defendants intended to inflict (Rest., Torts, §§ 279, 280, *supra*), merely because the decedent "knew what he was doing" when he killed himself.

Nor is foreseeability of the suicide a factor, as is indicated by the foregoing comments in the Restatement. In this connection it is interesting to note that Civil Code, section 3333, reads *"Breach of obligation other than contract:* For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, *whether it could have been anticipated or not."* (Italics added; and see the cases cited by Prosser in 38 Cal. L. Rev. at pp. 394-396.)

Nor can it be said that the act of suicide should be a defense by analogy to the doctrine of contributory negligence, on the

theory of *volenti non fit injuria*. ██ It is the general rule in this state that contributory negligence of the plaintiff is no defense to an action for an intentional tort. (*Seeger* v. *Odell*, 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; *Hefferan* v. *Freebairn*, 34 Cal.2d 715, 721 [212 P.2d 386]; *Goldman* v. *House*, 93 Cal.App.2d 572, 575-576 [209 P.2d 639]; *Richardson* v. *Pridmore*, 97 Cal.App.2d 124, 131 [217 P.2d 113, 17 A.L.R.2d 929]; *Cawog* v. *Rothbaum*, 165 Cal. App.2d 577, 587-591 [331 P.2d 1063].)

██ Consequently, we believe that, in a case where the defendant intended, by his conduct, to cause serious mental distress or serious physical suffering, and does so, and such mental distress is shown by the evidence to be "a substantial factor in bringing about" (Rest., Torts, §§ 279, 280) the suicide, a cause of action for wrongful death results, whether the suicide was committed in a state of insanity, or in response to an irresistible impulse, or not. This rule would not apply where the *act* of the defendant was intentionally done, but there was no intent to cause injury. It is applicable only where the actor *intended to cause injury*, and the injury is a substantial factor in bringing about the suicide, i.e., is really a cause, in fact, of the suicide. This does not mean that, in every case where the actor intentionally causes serious mental distress or physical suffering, and this is followed by suicide, the actor is necessarily liable for the suicide. The mental distress or physical suffering may not be, in the particular case, as a matter of fact, a substantial factor in bringing about the suicide. But all recorded history testifies that there are cases in which serious mental or physical suffering is in fact a cause of suicide.

There are few cases dealing with this question. *Salsedo* v. *Palmer* (2d Cir.), 278 F. 92, is contrary to our views, but the opinion, while conceding that as a result of torture, a man may kill himself, first says that, if he does so deliberately, his act is an intervening act for which defendant is not liable, and then adds that, if the killing is a result of suicidal mania, such mania is not a natural or reasonable result of either mental or physical torture. The opinion is, in our judgment, wrong on both grounds. It makes no distinction between intentionally injuring the deceased and negligently injuring him, and it relies primarily on the case of *Scheffer* v. *Washington City, etc., Railroad Co.*, 105 U.S. 249 [26 L.Ed. 1070], where the claimed liability was predicated solely upon negli-

gence. Moreover, the case was decided upon New York law, and the New York courts have refused to follow it. (*Cauverien* v. *De Metz*, 20 Misc. 144 [188 N.Y.S.2d 627, 632].) There was a strong dissent in the Salsedo case.

*Stevens* v. *Steadman*, 140 Ga. 680 [79 S.E. 564, 47 L.R.A. N.S. 1009], is relied upon in the Salsedo case, and it, too, fails to distinguish between intentionally injuring the decedent, thereby causing the suicide, and negligently doing so. The court was quite unwilling to believe that what the defendants did was in fact a cause of the suicide, a position which seems to us directly contrary to the allegations of the complaint in that case, which charged that the defendants, business associates of decedent, made certain charges against him, knowing that the charges would cause him to become mentally ill and intending to cause that result. Common experience and modern psychiatric knowledge both tell us that such a chain of causation can and does, in fact, occur.

*Jones* v. *Stewart*, 183 Tenn. 176 [191 S.W.2d 439], is similar, and relies upon the Salsedo and Stevens cases, *supra*, and upon cases involving negligence. The court thought that, under the allegations of the complaint, the accusations made against the suicide were not such as to give rise to any expectation that they would cause a suicide. But, as we have shown, this element—foreseeability of the particular injury—is a false quantity where the defendant intended to injure by causing serious mental distress. In fairness to the court in the Jones case, it should be added that the complaint did not directly charge such an intent, as it did in Salsedo and Stevens.

In *Cauverien* v. *De Metz, supra,* 20 Misc. 144 [188 N.Y.S.2d 627], the New York court ruled on a demurrer to a complaint which charged that the malicious and intentional conversion of a diamond entrusted to decedent and by him to defendants, induced an irresistible impulse in decedent to take his own life, and that he did so. The court said: "Upon this complaint the wrong is alleged to be intentional, and therefore the wrongdoer is responsible for the injuries directly caused even though they may be beyond the limits of foreseeability. Where, as here, reliance is placed upon the wilful and malicious intent to commit a wrongful act, the question of whether death by suicide could be the natural, proximate and legal consequence of the tort is one for the jury. The court cannot say, as a matter of pleading and resolving every fair intendment in

support of the pleader, that the full coverage of tort liability cannot embrace the facts and circumstances here involved. Nor can it say that the result is too tenuous or speculative merely because of difficulty or improbability of proof. In so holding the court construes the allegation or irresistible impulse in the third cause of action as sufficient to constitute an allegation of insanity. Under the first cause of action, the allegation of mere emotional upset is insufficient even if that cause were otherwise sustainable." (Pp. 632-633.) As to *Salsedo* v. *Palmer, supra,* 278 F. 92, where it was held that death due to suicidal mania as a result of torture was neither the natural nor reasonable consequence of the wrong, the New York court said: "The trend merging from the cases in tort liability since that time as well as the advances in medical science and knowledge of mental illness compel the conclusion the dissent in that case should be followed here." (P. 632.)

The court also said that even in the case of an intentional tort, the damage must be proximately caused by defendant. This latter statement was unnecessary to the decision, and, as we have seen, not all of the limitations on liability embodied in the rules of proximate cause as developed in negligence cases are applicable to intentional torts. We think that the court was correct in refusing to follow the Salsedo case. But we do not agree with all of its reasoning as to proximate cause, particularly its belief that the "voluntary" act of decedent would be an independent intervening cause. However, the result seems correct—the intentional act in the case was a conversion of property. There was not the intentional infliction of an injury of the type that would cause a suicide, that is, serious physical suffering or serious mental distress.

We find no other cases dealing with this question. But our own Supreme Court has held that, where A shot B, and as a result B cut his own throat, from which wound he died, A can be found to have caused the death of B. (*People* v. *Lewis,* 124 Cal. 551, 555 [57 P. 470].) The court, Temple, J. said: "But if the deceased did die from the effect of the knife wound alone, no doubt the defendant would be responsible, if it was made to appear, and the jury could have found from the evidence, that the knife wound was caused by the wound inflicted by the defendant in the natural course of events. If the relation was causal, and the wounded condition of the deceased was not merely the occasion upon which another cause intervened, not produced by the first wound or related

912

to it in other than a casual way, then defendant is guilty of homicide.'' The court also pointed out that the suicide, under other circumstances, might not be ''caused''˙by the shooting (p. 556) : ''Suppose one assaults and wounds another intending to take life, but the wound, though painful, is not even dangerous, and the wounded man knows that it is not mortal, and yet takes his own life to escape pain, would it not be suicide only? Yet, the wound inflicted by the assailant would have the same relation to death which the original wound in this case has to the knife wound. The wound induced the suicide, but the wound was not, in the usual course of things, the cause of the suicide.''

So in our case, the defendants would only be liable if (a) they intentionally caused severe physical or mental distress to decedent, and (b) that physical or mental distress was severe enough to be, in the judgment of the trier of the fact, a substantial factor in bringing about the suicide.

We find many cases in which the courts have recognized that even ''voluntary'' suicide may be, both in fact and in law, caused by the defendant's wrongful conduct. These are cases in which a special duty toward the suicide exists, either by reason of statute or by reason of a special relationship between the defendant and the suicide. In such cases, the courts do not find that the ''voluntariness'' of the suicide makes it an independent intervening cause, thus defeating liability. We think that suicide resulting from intentionally inflicting injuries of the type here involved should be similarly treated.

Thus, in the case of the so-called ''civil damage'' or ''dramshop'' laws, which makes a saloonkeeper liable to a man's family for selling him too much liquor, several cases hold the saloonkeeper liable for causing suicide, even though the intoxication was neither the sole nor the principal cause, so long as it was a contributing cause of the suicide. The cases are collected in a note in 11 A.L.R.2d at pages 765-775. So, too, a hospital or asylum having in its charge a person whose illness is such that he may do himself harm if not protected against himself, is liable if, because of failure of the institution to guard him, he commits suicide. In these cases, there is a specific duty of care owed to the decedent, and neglect of that duty is the basis of the liability, and in none of them is the voluntary act of the decedent in killing himself held to be an independent intervening cause relieving the institution of responsibility. See note, 11 A.L.R.2d at pages 775-799. In *Wood* v. *Samaritan Institution,* 26 Cal.2d 847 [161 P.2d

556], it was held that a verdict was improperly directed against a chronic alcoholic who entered the defendant institution for treatment, was not properly guarded by defendant, and jumped from a second-story window, sustaining injuries. No suggestion was made that plaintiff's own act was an independent intervening cause of her injuries.

The Restatement of Torts, sections 279 and 280, speak of harm "of the type intended" by the actor. We think that either serious bodily harm such that it would cause serious mental distress (*People* v. *Lewis, supra,* 124 Cal. 551) or serious mental distress alone, if intentionally caused, are such that the harm of suicide, in fact caused thereby, is "of the type intended" within the rule of the Restatement.

We feel free so to hold in part because of the fact that suicide is not a crime in this state, so that we are not confronted with the principle, announced by Holmes " (Collected Legal Papers," *supra,* p. 117, at p. 132) as a limitation upon liability, that a man "has a right to rely upon his fellow-men acting lawfully, and, therefore, is not answerable for himself acting upon the assumption that they will do so, however improbable it may be." (Compare *Huber* v. *Henry J. Kaiser Co.,* 71 Cal.App.2d 278, 287-288 [162 P.2d 693].)

4. *Liability for negligently causing injury that causes suicide.*

In the case of negligent or unintended injury (the latter meaning intentional acts, but not acts intended to injure), the doctrine of independent intervening cause is well established, in this state as elsewhere. (Rest., Torts, §§ 442-453; *Stasulat* v. *Pacific Gas & Electric, supra,* 8 Cal.2d 631; *Stultz* v. *Benson Lumber Co.,* 6 Cal.2d 688 [59 P.2d 100]; *McMillan* v. *Thompson,* 140 Cal.App. 437 [35 P.2d 419]; *Newman* v. *Steuernagel,* 132 Cal.App. 417 [22 P.2d 780].) As has been pointed out, this is a limitation on liability for causation which does exist in fact, but is said, for reasons of policy, not to exist in law.

The real question is whether the act of suicide is such an intervening force as to break the chain of events flowing from the acts complained of and to make those acts not the "proximate cause" of the death. "As a general rule a person will not be relieved of liability by an intervening force which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. However, if such intervening force takes the form of suicide the practically unanimous rule is that such act is a new and independent agency

914

which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide.'' (11 A.L.R.2d 757.) This is the older rule and it seems to have been applied whether the original acts were done negligently or with intention to injure. The leading case is *Scheffer* v. *Washington City, etc., Railroad Co.* (1881), *supra,* 105 U.S. 249.

However, in later years the rule has been somewhat changed. (See cases cited in 11 A.L.R.2d at p. 758.) The modern rule is expressed in *Cauverien* v. *De Metz, supra,* 188 N.Y.S.2d 627, 632: ''The overwhelming weight of authority is to the effect that a suicide—absent insanity—is a new and independent agency which breaks the causal connection between the wrongful act and death, precluding an action under the wrongful death statutes. . . . It has also been recognized, however, that where the suicide is committed in a state of insanity in response to an uncontrollable impulse, recovery may be had if the mental state of the deceased was caused by the defendant's wrongful act. [Citations.]'' After pointing out that this was a case of first impression in New York, the court held that the rule above mentioned, ''which has been adopted by the Restatement and text writers, is a more realistic approach to the problem and the one that should be adopted in this state.'' (P. 632.) See also *Elliott* v. *Stone Baking Co.,* 49 Ga.App. 515 [176 S.E. 112].

Restatement of Torts, section 455, states: ''If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.''

Prosser, Law of Torts, 2d edition, pages 273-274, states: ''Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it seems the better view that when his insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable. The situation is the same as if he should hurt himself during unconsciousness or delirium brought on by the injury.

But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supersedes the defendant's liability.''

 As this is a case of first impression in California we agree with the New York court that the more realistic approach to the problem is to adopt the before mentioned rule, namely, that where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of ''insanity,'' and of ''delirium or frenzy,'' and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in the light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent ''knew what he was doing.'' If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.

We find support for our position in certain California cases. In *Baker* v. *Board of Fire P.F. Commrs.* (1912), 18 Cal.App. 433, 435 [123 P. 344], the widow of a fireman sought a writ of mandate to compel the payment to her of a pension. The city charter provided for a pension for the widow of any fireman '' 'who may be killed while in the performance of his duty.' '' On June 15, the decedent fireman, in line of duty, suffered a broken back when a hose wagon overturned. He suffered great pain and anguish, which caused him to become insane, and while insane, he killed himself, on September 3.

The court held that he was killed while in the performance of his duty, saying: ''The injuries which Baker received may justly be said to have been the proximate cause of his death. They set in motion a train of events, operating from cause to effect, that, without the intervention of any outside and independent cause, resulted in his death.

''We say that his death was not brought about by the intervention of any outside and independent cause advisedly, for although his own hand inflicted the wound of which he died,

this was not an act for which he was either legally or morally responsible. Upon this phase of the argument the cases holding that suicide or self-destruction while insane does not exempt an insurer from liability under a policy excepting from the risk of death by suicide or the insured's own hand, where the insured commits suicide while insane, are illuminative. (See *Mutual Life Ins. Co.* v. *Terry*, 82 U.S. 580 [21 L.Ed. 236]; *Breasted* v. *Farmer's Loan & Trust Co.*, 8 N.Y. 299 [59 Am.Dec. 482]; *Newton* v. *Mutual Benefit Life Ins. Co.*, 76 N.Y. 426 [32 Am.Rep. 335]; *Accident Ins. Co.* v. *Crandal*, 120 U.S. 527 [30 L.Ed. 740, 7 S.Ct. 685].)

"It has been said that 'self-destruction by a fellow-being bereft of reason can with no more propriety be ascribed to the act of his own hand than to the deadly instrument that may have been used by him for the purpose,' and was no more his act in the sense of the law 'than if he had been impelled by an irresistible physical force.' (*Accident Ins. Co.* v. *Crandal*, 120 U.S. 527 [30 L.Ed. 740, 7 S.Ct. 685].)

"So in the case at bar, Baker cannot be said to have been the cause, either morally or legally, of his own death. The primary and efficient cause of his death was the dreadful injuries he received. These injuries set in motion a chain of events that, operating in a direct line from cause to effect and without the intervention of any independent force, resulted in his death. His death resulted without the intervention of any independent force, for the self-inflicted wound was the result of the insanity, which was in turn caused by the injuries. The injuries were thus the efficient and proximate cause of his death. 'An efficient, adequate cause being found, must be deemed the true cause, unless some other cause not incidental to it, but independent of it, is shown to have intervened between it and the result.' (*Travelers' Ins. Co.* v. *Murray*, 16 Colo. 296 [25 Am.St.Rep. 267, 26 P. 774].)'" (Pp. 436-437 of 18 Cal.App.)

*Faber* v. *Board of Pension Commrs.* (1943), 56 Cal.App.2d 825 [133 P.2d 404], cites and follows the Baker case, and applies the rule in a case where the suicide occurred some nine years after the injury. In discussing the evidence, the court cited two Massachusetts cases, *Daniels* v. *New York, N. H. & H. R. Co.* (1903), 183 Mass. 393 [67 N.E. 424], and *In re Sponatski* (1915), 220 Mass. 526 [108 N.E. 466]. The Daniels case lays down a narrow rule comparable to that in *Scheffer* v. *Washington City, etc., Railroad Co., supra.* In the Faber case, the court did not follow this rule, but used the following

significant language: "At the inception of the trial defendants took the position, which they still maintain, that the act of self-destruction could not be held to have resulted from the insane condition of mind unless it was established that the deceased was unable to understand 'the physical character, nature, quality or consequence of his act'; but expressions in the cases upon which they rely must be construed in the light of the facts under consideration and within the limits of the matters which were decided. The cases we mention and others of similar import do hold that one who is mentally unsound may nevertheless be capable of a voluntary and willful act of suicide, and that the act will be deemed voluntary if it is shown to have resulted from the exercise of 'a moderately intelligent power of choice.' But they do not hold that one possessing moderate intelligence may not fail to use it and act under the influence of an insane impulse. If, as the court found, Fred Faber was wholly devoid of understanding and took his life without consciousness of what he was doing, it would have been, unquestionably, the act of an insane man and in law an involuntary act. Defendants would have us construe the finding as meaning that he was at all times wholly without capacity to understand the nature and consequences of an act of shooting himself in the head and they then assail the finding as unsupported by the evidence." (P. 829.) "We do not construe the finding as having the breadth and meaning which defendants seek to attribute to it, that is to say, that Faber was entirely devoid of understanding, nor is it necessary to so construe it in order to have support for the judgment. The human mind is such that it may direct rational conduct at some times or in some situations and with relation to some subjects of action and yet without the employment of reasoning processes at other times may direct irrational or insane conduct in the same or other situations and with relation to the same or other subjects of action. . . . The finding as to Faber's want of understanding should be construed as referring to the immediate time of the fatal act. The question before the court was whether his admitted insanity was the efficient cause of his self-destruction; in other words, whether at that time, he was capable of acting and did act of his own volition and rationally or whether he acted under the influence of an insane impulse. It may be conceded that ordinarily he conducted himself in a rational manner and yet, as we shall point out, he flourished, manipulated and fired his revolver

upon innumerable occasions as no sane person would have done. A finding that the act of self-destruction was the proximate result of the unbalanced mental condition would have been sufficient upon this issue of proximate cause; it would necessarily have negatived the supposition that the act was voluntary. The finding in question is sufficient to determine the particular issue of proximate cause or, in other words, that the act was irrational and therefore involuntary; if it goes further than that, which we doubt was intended, it is still sufficiently supported if the evidence warranted a reasonable inference that the act of shooting resulted proximately from an insane impulse." (Pp. 830-831.)

While contributory negligence of the decedent is a defense to an action for wrongful death (*Buckley* v. *Chadwick,* 45 Cal.2d 183 [288 P.2d 12, 289 P.2d 242]), we do not think that suicide of the decedent, proximately caused by defendants' negligence within the limits that we have laid down, is analogous. It would be anomalous to find contributory negligence when the conduct of the decedent, relied on as showing contributory negligence, is involuntary, and is itself caused by defendants' wrongful act.

We need not and do not now decide whether, in those cases where it would be proper to treat the act of suicide as an independent intervening act because it was truly voluntary, this would still not be a defense if, under the particular circumstances of the case, a truly voluntary suicide was a reasonably foreseeable result of the defendants' wrongdoing. The usual rule is "that the intervening act of a third person does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing." (*Davis* v. *Erickson,* 53 Cal.2d 860, 863 [3 Cal.Rptr. 567, 350 P.2d 535].) It is arguable that the same rule might apply to the act of decedent. (*Crane* v. *Smith,* 23 Cal.2d 288, at p. 301 [144 P.2d 356].) No facts are alleged that raise this question.

### CONCLUSION

 Applying the foregoing to the case at bar, it clearly appears that the complaint is insufficient. The second cause of action does not state whether the decedent's mental disturbance was such that in committing suicide he was acting under an uncontrollable impulse. The complaint is also subject to the special demurrer. For example, it does not appear what the "threats, statements and accusations" were. The de-

murrer was properly sustained. Nevertheless, the complaint states the nucleus of a cause of action. It alleges wrongful acts done both intentionally and negligently, which caused a mental condition which resulted in the suicide. Therefore, and as the rule in California is here being established for the first time, plaintiffs should be given an opportunity to amend if the facts as they exist can constitute a cause of action under the above mentioned rules.

The judgment is reversed and the cause remanded for the trial court to give plaintiffs an opportunity to amend. Each party will bear its own costs.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied June 13, 1960.