[Civ. No. 13509. Second Dist., Div. Three. Jan. 27, 1943.]

GLADYS FABER, Respondent, v. THE BOARD OF PENSION COMMISSIONERS OF THE CITY OF LOS ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, and Robert J. Stahl, Leonard Husar and Edward J. Olstyn, Deputies City Attorney, for Appellants.

Jerome J. Mayo and Guy H. Hayes for Respondent.

SHINN, J.—Defendants and appellants are the Board of Pension Commissioners of the City of Los Angeles and certain individuals who constitute the board. They appeal from a judgment granting petitioner, widow of Fred Faber, a peremptory writ of mandate requiring them to award petitioner a pension pursuant to article XVII, section 183, of the Los Angeles City Charter, under which the dependent widow of a policeman is entitled to a pension if her husband "shall die as the result of any injury received during the performance of his duty." The court found that Fred Faber's death did occur by reason of such injury; that the immediate occasion of his death was a gunshot wound of the head inflicted upon himself; that injuries which he received while on duty were the direct and proximate cause of his mental condition, which was such that he was unable to understand the physical character, nature, quality, or consequences of his act; that the act itself was a direct result of said mental condition and was directly and proximately caused by and resulted from said injuries received during the performance of his duties.

Defendants challenge the sufficiency of the evidence to sustain findings (1) that Fred Faber's mental condition was the cause of the shooting, (2) that the injury received while on duty was the proximate cause of his mental condition in August of 1939, and (3) a finding (which the court did not make) that he committed "suicide."

Fred Faber entered the Police Department of the city in the year 1925 at the age of 24 years. He was a reserved, well poised, dependable, and normal young man with a high school education. He was of good mentality, industrious, diligent, and in good health. After he went into the department he did some drinking but not to an immoderate degree. He was first assigned to vice and liquor investigation work. He was injured on the 28th of April, 1930, in the course of duty

apprehending violators of the liquor laws, at which time he was hit over the head with a bottle, for which he received treatment at the receiving hospital. There was evidence that when he returned home that evening he staggered, his eyes were "dazed and slightly crossed," and the head wound was bleeding underneath the bandage. The cut on the head was a deep one in the right occipital region and it was surrounded by a swelling about the size of an egg. From the time of his injury he was extremely nervous, drank heavily, and was unable to sleep without sedatives, of which he took excessive amounts of nembutol, barbital and amytol. He became irritable, abusive toward his wife, frequently complained of headaches, became critical and suspicious, irregular in his habits, and careless of his personal appearance. He had frequent dizzy spells and was guilty of much erratic and irrational conduct, which continued over a period of years and to the day of his demise. On the day of his death his wife was absent from home visiting her parents. At about 10 o'clock in the evening he was conversing with his mother in his home and appeared to be more rational than usual. He went to his room and lay down without removing his clothes, but did not go to sleep. He did some telephoning and a married couple came to see him and with the mother entered the bedroom where he was reclining on the bed. Their conversation with deceased continued until about 1 a. m.; while he lay on the bed his revolver was beside him; his mother suggested that he put it on the table, whereupon he picked it up, held it to his head, pulled the trigger and fired the shot which caused his death.

Our attention will first be directed to the finding that the injury was the proximate cause of the deranged mental condition. Defendants upon the trial conceded and now concede, quite properly, that deceased did suffer from mental derangement. There was an abundance of evidence, which it is unnecessary to recite in the present connection, that this mental condition first manifested itself almost immediately after he received the head injury on April 28, 1930. This condition of mental aberration continued, accompanied by some physical deterioration, down to the time of his death. Before he received the injury to his head he had been entirely rational. The fact that the unbalanced mental condition immediately followed the receipt of the head injury would be somewhat convincing evidence to the lay mind that it resulted from the injury, but the finding of the court is also supported by ex-

pert testimony. In reply to a hypothetical question, a physician, admittedly a specialist in psychiatry, testified on behalf of petitioner that in his opinion the injury of April 28, 1930, was the cause of the mental unbalance. Another psychiatrist, testifying for defendants, expressed a contrary opinion. The trial judge heard the examination of these witnesses by counsel at great length and was fully warranted in accepting the opinion of the physician who testified in petitioner's favor as the more reasonable. Defendants argue at length the weight of the evidence upon this issue, which, of course, is not for us to pass upon, but it is worthy of note that, in the evidence which they produced, no facts were established and no medical theory was advanced in an attempt to attribute the mental derangement to a cause other than the head injury. Our attention has not been called to any evidence and our search of the record discloses none which, in our opinion, would have justified a finding that the mental condition was due to any other cause.

Defendants also discuss extensively the evidence as to the causal connection between the mental condition and the act of self-destruction, contending that there was no evidence to support a finding that the act was the direct and proximate result of the condition. In their analysis of the evidence upon this point, defendants accept as the controlling rule of law a statement of the court in *Daniels* v. *New York, N. H. & H. R. Co.*, (1903) 183 Mass. 393 [67 N.E. 424, 426, 62 L.R.A. 751], as follows: " . . . the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, [injury] and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues . . . That he was insane, so as to be free from moral responsibility, is not enough to make the defendant liable. We are unable to discover any evidence that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act. In the absence of any affirmative evidence for the plaintiff upon this point, the jury should have been instructed to render a verdict for the defendant." This statement was

made in criticising a charge to the jury which was held to be too favorable to the plaintiff. In the same connection the court said: "All the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life; that he closed the door, and locked it, with a view to exclude others and prevent interruption; and that he then took the napkin and used it effectively to strangle himself. All this points to an understanding of the physical nature and effect of his act, and to a willful and intelligent purpose to accomplish it." The same court in *In re Sponatski*, (1915) 220 Mass. 526 [108 N.E. 466, L.R.A. 1916A, 333], in approving the statement we have quoted from the Daniels case, upheld a finding that an employee met death in the course of and arising out of his employment, where as the result of an injury he became insane and threw himself from the window of a hospital, which act of self-destruction, it was found, "did result from an uncontrollable impulse and without conscious volition to produce death."

At the inception of the trial defendants took the position, which they still maintain, that the act of self-destruction could not be held to have resulted from the insane condition of mind unless it was established that the deceased was unable to understand "the physical character, nature, quality or consequences of his act"; but expressions in the cases upon which they rely must be construed in the light of the facts under consideration and within the limits of the matters which were decided. The cases we mention and others of similar import do hold that one who is mentally unsound may nevertheless be capable of a voluntary and willful act of suicide, and that the act will be deemed voluntary if it is shown to have resulted from the exercise of "a moderately intelligent power of choice." But they do not hold that one possessing moderate intelligence may not fail to use it and act under the influence of an insane impulse. If, as the court found, Fred Faber was wholly devoid of understanding and took his life without consciousness of what he was doing, it would have been, unquestionably, the act of an insane man and in law an involuntary act. Defendants would have us construe the finding as meaning that he was at all times wholly without capacity to understand the nature and consequences of an act of shooting himself in the head and they then assail the finding as unsupported by the evidence. They preface their argument with a recital of all of his acts and conduct which were

admittedly rational and then assert that these facts conclusively show that he did have sufficient mental capacity and understanding to know the character, nature, quality and consequences of an act of self-destruction. We do not construe the finding as having the breadth and meaning which defendants seek to attribute to it, that is to say, that Faber was entirely devoid of understanding, nor is it necessary to so construe it in order to have support for the judgment. The human mind is such that it may direct rational conduct at some times or in some situations and with relation to some subjects of action and yet without the employment of reasoning processes at other times may direct irrational or insane conduct in the same or other situations and with relation to the same or other subjects of action.

It has been held in this state, and in a proceeding such as the one before us, that self-destruction resulting from insanity is involuntary and that the victim is without legal or moral responsibility for the act. As we understand the findings in our case they purport to decide the same questions of fact that were held in *Baker* v. *Board of Fire P. F. Commrs.* (1912) 18 Cal.App. 433, 436 [123 P. 344], to support a conclusion that self-imposed death occurred "while in the performance of duty." The court there said: "So in the case at bar, Baker cannot be said to have been the cause, either morally or legally, of his own death. The primary and efficient cause of his death was the dreadful injuries he received. These injuries set in motion a chain of events that, operating in a direct line from cause to effect and without the intervention of any independent force, resulted in his death. His death resulted without the intervention of any independent force, for the self-inflicted wound was the result of the insanity, which was in turn caused by the injuries. The injuries were thus the efficient and proximate cause of his death. 'An efficient, adequate cause being found, must be deemed the true cause, unless some other cause not incidental to it, but independent of it, is shown to have intervened between it and the result.' (*Travelers' Ins. Co.* v. *Murray*, 16 Colo. 296 [25 Am. St.Rep. 267, 26 P. 774].)"

The finding as to Faber's want of understanding should be construed as referring to the immediate time of the fatal act. The question before the court was whether his admitted insanity was the efficient cause of his self-destruction; in other words, whether at that time, he was capable of acting

and did act of his own volition and rationally or whether he acted under the influence of an insane impulse. It may be conceded that ordinarily he conducted himself in a rational manner and yet, as we shall point out, he flourished, manipulated and fired his revolver upon innumerable occasions as no sane person would have done. A finding that the act of self-destruction was the proximate result of the unbalanced mental condition would have been sufficient upon this issue of proximate cause; it would necessarily have negatived the supposition that the act was voluntary. The finding in question is sufficient to determine the particular issue of proximate cause or, in other words, that the act was irrational and therefore involuntary; if it goes further than that, which we doubt was intended, it is still sufficiently supported if the evidence warranted a reasonable inference that the act of shooting resulted proximately from an insane impulse.

Attention will now be directed to evidence which, in our opinion, amply sustains the finding that the mental disorder was the immediate, proximate cause of the act which accomplished Faber's death. We shall not dwell upon the evidence which shows the rational and fairly normal nature of Faber's conduct while he was on duty as a police officer. It may be that he performed his duties in an intelligent manner and with reasonable efficiency, but if so it would not follow that his power to reason and to understand and appreciate the consequences of his act was not overcome or supplanted by a thoughtless and irrational impulse to commit the fatal act. The fact that a person acts rationally part of the time, or most of the time, is not irreconcilable with the fact that he consistently acts irrationally with reference to particular subjects of thought and action. The evidence which bears most directly and forcefully upon the issue of the proximate cause of the fatal shooting is that which relates to the conduct of the deceased in the performance of acts of a similar nature. There were many specific instances of insane conduct, which began shortly after his injury and extended through the following years to the time of his death.

He habitually carried his gun with five chambers loaded and one empty and frequently pointed it at objects and pulled the trigger so as to allow the hammer to fall upon the empty chamber. In May of 1930 he was first seen to put the gun against his head and pull the trigger and from that time on he frequently repeated this exhibition; at times he would put

the barrel in his mouth and pull the trigger. In June of 1930 he fired a shot in his bedroom and when his mother asked him what had happened, stating that she thought he knew how to handle a gun, he replied, "I do," and shot into the mattress of his bed. In 1931, in the living room of his home, while his 10-year-old niece was seated upon a davenport, he suddenly shot past her head, missing her by inches. In 1935 he came home about 3 o'clock in the morning; his wife hid behind a bedroom door; he shot all the shells in his gun into the floor around her feet. When she emerged from behind the door after about an hour, he was lying on the bed apparently asleep. In 1937 he arose from bed about 2 a. m., went outdoors and fired a shot at some birds which had been chirping outside the window and returned, saying, "Well, I guess I've killed them all right." In the same year, in the presence of his mother and wife, he shot through the upholstery of a divan. In 1939, when he was having dinner with his wife and another married couple in a Chinese restaurant, he abused the waiter, went outside and emptied his gun into the building. The party left the restaurant and Faber said, when questioned as to his conduct, "Oh, there's lots of rats out there that need to be cleaned out." On the way home he insisted upon riding in a rumble seat; his wife looked back, found that he was not in the seat but had been riding on top of the car. In 1937, while riding with his wife, he amused himself by shooting out street lights. In 1939 he went into his back yard where his wife had put flower pots on a ledge and shot them off, one by one. During the entire period in question he drove his car at frantic and reckless speed, apparently enjoying the discomfiture of his passengers. On one occasion he grabbed a Bible from his wife's hand and tore it to bits. Between 1930 and 1939 the Fabers lived in many different houses and in each one of them he shot holes in the walls and in the furniture. He frequently used violence upon the person of his wife, upon one occasion tore up her fur jacket and upon another occasion tore off a dress she was wearing. In 1933 he threatened to destroy the piano with an ax or hammer, was prevented from doing so by his wife and mother, but did break some windows in the house. A fellow officer testified to having prevented him from stealing a pillow from an automobile. There were other shooting episodes and erratic actions similar to the foregoing.

Following his injury Faber began to drink to excess, al-

though he continued to do his work as a police officer in a reasonably efficient manner. His irrational acts were usually committed when he had not been drinking. It does not appear that he was more violent or irrational when he had been drinking than when he was entirely sober. During all of that time Faber suffered from minor ailments such as colds and slight physical injuries, but to his wife and mother and intimate friends he complained constantly of pains in the head, nervousness, and inability to sleep. He occasionally made similar complaints to his fellow officers. He indulged heavily in sedatives and in liquor to produce sleep. He was occasionally under the care of physicians and complained to his wife and mother that the doctors could do nothing for him. He appears not to have sought treatment at the receiving hospital for his more serious condition although he was treated there for minor ailments.

Petitioner's expert witness, to whom we have referred, testified that in his opinion there was a causal connection between the mental condition and the fatal shooting.

Upon this evidence the trial court was well justified in finding that the act which caused Faber's death resulted directly and proximately from his deranged mental condition. It was but one of an infinite number of irrational acts which were of the same violent character. They were erratic, unreasonable and pointless; he made no effort to excuse or explain them. He acted suddenly, impulsively, and without regard for consequences. It would be useless to endeavor to understand the mental processes and impulses of such a man or to endeavor to convince ourselves that his violent actions were controlled by reason at all; it is too clear that he was governed by sudden impulses and not by the volition of a sane mind.

The trial court found, "It is true that the immediate occasion of his death was a self-inflicted gunshot wound of the head; it is further true that said Fred Faber inflicted said wound upon himself as a result of his said unbalanced mental condition at said time." Counsel on both sides construe this to be a finding that Fred Faber committed suicide. They use the word "suicide" loosely, as implying an act that was in some measure voluntary, as distinguished from one that was purely accidental. Defendants assail the finding, contending that the evidence shows conclusively that death was acci-

dental. The court assuredly did not find that Faber knowingly or intentionally killed himself; the findings were to the contrary. But we cannot see that it makes any difference whether the shooting was suicidal (as counsel use the word) or purely accidental. If "suicidal" it could be more readily accounted for as having resulted from an insane impulse than from deliberate action. If death was accidental it was the unexpected but not unforeseeable result of one of a long series of impulsive, violent and irrational acts. The surprising part of it is that these acts did not result in other fatalities or serious injuries. The evidence strongly indicated that this whole course of conduct was due to mental derangement and we think there was no reason to believe that the final act was less irrational than those that had preceded it. The probability that the fatal shooting was due to mental unbalance was stronger if, as defendants contend, death was accidental and not intentional. In either event the consequences which followed in unbroken sequence Fred Faber's injury, received while in the performance of his duty, fully establish petitioner's right to a widow's pension.

The judgment is affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.